# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE JESUS CORONADO,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant.<br>_____ | 1:10-cv-00594-AWI-SKO<br><br>**FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT**<br><br>(Doc. 1) |

## I. BACKGROUND

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Title II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] On May 18, 2010, the action was referred to the Honorable Sheila K. Oberto for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305.

## II.   FACTUAL BACKGROUND

Plaintiff was born in 1958 and previously worked as a handyman. (Administrative Record ("AR") 96, 109.) Plaintiff has obtained a General Education Development ("GED") certificate, but has had no further education or training. (AR 26.) Plaintiff filed the current applications for DIB and SSI on January 24, 2007. (AR 15, 83-93.) Plaintiff alleges that he became unable to work on June 1, 2006, due to "slipped discs" in his back, a "bad right knee," a spur on his right heel, and arthritis (AR 83, 108.)[2]

**A.   Medical Evidence**

Plaintiff asserts that his inability to work is due to an injury that occurred on December 14, 2004, which resulted in back pain. (AR 108, 144.) Plaintiff also suffers from right knee pain and arthritis. (AR 108.) Plaintiff saw Dr. San Tso, his treating physician, for general medical treatment between 2005 and 2008. (AR 175-196.)

**1.   Medical Records Prior to June 1, 2006**

Plaintiff began seeing Dr. San Tso on February 4, 2005, due to knee pain he had been experiencing during the prior month and a half. (AR 196.)   Plaintiff reported taking Vicodin[3] and Codeine[4] during this visit. (AR 196.) On February 7, 2005, an x-ray of his right knee revealed inflammation, but no other significant impairments. (AR 209.) Following a magnetic resonance imaging ("MRI") scan of his lumbar spine on February 16, 2005, Plaintiff was diagnosed with degenerative disc disease by Dr. Hamid Javaherian. (AR 207-08.) Plaintiff returned to Dr. Tso on February 25, 2005, for a follow-up appointment and reported that his pain was better. (AR 195.)

Plaintiff was referred to Dr. Karl Gregorius, a treating physician, on March 15, 2005, for degenerative disc disease treatment. (AR 205.) In a March, 23, 2005, letter, Dr. Gregorius stated that Plaintiff had a pain level of four out of ten localized to his lumbar spine, less pain in his right leg, no pain in his left leg, had undergone no physical therapy, and was not "a surgical candidate

---

[2] Prior to the current application for benefits, Plaintiff filed another application for DIB, which was denied on reconsideration on June 3, 2005. (AR 103-04.)

[3] Vicodin is a narcotic drug "trademark[ed] for combination preparations of hydrocodone bitartrate and acetaminophen." *Dorland's Illustrated Medical Dictionary* 2084 (31st ed. 2007).

[4] Codeine is a narcotic drug. *Dorland's Illustrated Medical Dictionary* 386 (31st ed. 2007).

2

because his pain ha[d] improved significantly since it was severe a month ago." (AR 140, 204.) Dr. Gregorius noted that Plaintiff would begin physical therapy and return in six weeks. (AR 140, 204.) He also noted that he would extend Plaintiff's temporary total disability ("TTD") by eight weeks. (AR 140, 204.)

On April 15, 2005, Plaintiff saw Dr. Tso for a follow-up appointment and reported that he had seen Dr. Gregorius and was undergoing physical therapy. (AR 194.) Plaintiff returned to see Dr. Gregorius on May 4, 2005. (AR 139, 203.) In a May 4, 2005, letter, Dr. Gregorius stated that Plaintiff had "a constant, burning sensation in the lumbar spine . . . [and] burning in the shoulders, on both sides." (AR 139, 203.) Dr. Gregorius indicated that Plaintiff had no leg pain, had attended physical therapy, where he learned exercises to do at home, and "it would [not] be advisable for [Plaintiff] to have surgery . . . [because] his pain is all gone now." (AR 139, 203.) Dr. Gregorius noted that Plaintiff "will look for another line of work since I do not think he can go back to lifting, bending and stooping." (AR 139, 203.) Dr. Gregorius continued Plaintiff's "TTD until he can find another area of work" and would see him again as necessary. (AR 139, 203.)

On June 10, 2005, Plaintiff saw Dr. Tso for a follow-up appointment. (AR 193.) Dr. Tso noted that Plaintiff was "not taking anything for pain . . . not working . . . having [an increase in] pain . . . [and] cannot lift, bend or stretch . . . or sit for long periods of time." (AR 193.) Dr. Tso stated that Plaintiff "should be on disability." (AR 193.) Dr. Tso noted prescriptions for Naproxen,[5] Promethazine[6] with Codeine, and Hydrocodone-acetaminophen.[7] (AR 193.)

On July 14, 2005, Plaintiff saw Dr. Tso for a check-up. (AR 191.) Dr. Tso noted Plaintiff's pain and degenerative disc disease. (AR 191.)

Dr. Gregorius examined Plaintiff again on August 31, 2005. (AR 141.) Dr. Gregorius prepared a letter which did not report any physical therapy but did state that Plaintiff had a "tingling

---

[5] Naproxen is "[a] nonsteroidal antiinflammatory drug . . . use in the treatment of pain, inflammation, osteoarthritis . . . [and] fever." *Dorland's Illustrated Medical Dictionary* 1251 (31st ed. 2007).

[6] Promethazine is a drug "used to provide bedtime [sedation] . . . and as an ingredient in cough and cold preparations." *Dorland's Illustrated Medical Dictionary* 1549 (31st ed. 2007).

[7] Hydrocodone-acetaminophen is a narcotic drug, which is a more powerful sedative than codeine, combined with a pain reliever and fever reducer. *Dorland's Illustrated Medical Dictionary* 890, 12 (31st ed. 2007).

3

sensation down the right leg all the time" and that Plaintiff "does not want to consider surgery right now," although the possibility for surgery was discussed. (AR 141.) Plaintiff claimed to have "seen a consultant in Mexico who advised him against having surgery . . . [and] fe[lt] like he would rather live with his problem than have an operation." (AR 141.) Plaintiff claimed to "work[] for a day and then has to spend three days in bed." (AR 141.) Additionally, Plaintiff complained of "an inability to work." (AR 141.) Dr. Gregorius noted that he "thinks the [Plaintiff] is permanently, totally, and completely disabled from any occupation." (AR 141.) He recommended Plaintiff "apply for Social Security Disability." (AR 141.)

On September 27, 2005, Plaintiff saw Dr. Tso for a follow-up appointment; he noted Plaintiff's daily exercises and that he was given the option of surgery with Dr. Gregorius. (AR 190.) On December 12, 2005, Plaintiff was seen for a possible toe fracture to his right, little toe caused by stubbing it on a desk, but an x-ray was negative. (AR 189, 201.) On April 5, 2006, Dr. Tso reported that Plaintiff suffered from degenerative disc disease. (AR 188.) Dr. Tso also assessed Plaintiff as disabled. (AR 188.)

### 2. Medical Records After June 1, 2006

On September 13, 2006, Plaintiff saw Dr. Tso for cold symptoms, but did not report pain in his back or knees, and a physical exam of his back was "within normal limits." (AR 187.) Dr. Tso did note, however, that Plaintiff was experiencing degenerative disc disease with radiculpathy. (AR 187.) On October 3, 2006, Plaintiff again saw Dr. Tso for cold symptoms but did not report pain in his back or knees. (AR 186.)

On April 26, 2007, Plaintiff was given a "complete orthopedic evaluation" by Dr. Nathan Pliam, a consultative examining orthopedic surgeon. (AR 144-50.) Plaintiff complained of "back pain and knee pain." (AR 148.) Dr. Pliam observed that Plaintiff "sits and stands with normal posture. The [Plaintiff] is able to arise from a chair without difficulty. The [Plaintiff] walks normally. He can walk on his toes slowly with some apparent discomfort. He states that he is unable to walk on his heels due to heel pain." (AR 145-46.) Plaintiff's range of motion for his cervical spine was within normal limits, and his range of motion in his upper extremities, including shoulders, elbows, wrists, hands and fingers, was within normal limits. (AR 146.) His range of

4

motion in his lower extremities, including hips, knees, ankles and feet, was also within normal limits. (AR 147.)

After examining Plaintiff and reviewing his medical records, Dr. Pliam diagnosed him with "[c]hronic low back pain with radiologically documented spondylosis at multiple levels." (AR 148.) Dr. Pliam opined that Plaintiff was limited as follows:

> [L]ifting 20 pounds[] occasionally and 10 pounds repetitively. Bending should be limited to occasional. Sitting should be limited to two hours continuously for a cumulative total of six hours per day. Standing in one place should be limited to 30 minutes, continuously for a cumulative total of two hours per day. The [Plaintiff] should be precluded from posturally demanding activities such as crouching, crawling, squatting, climbing, etc.

(AR 148.)

On May 8, 2007, Dr. John Meek, a non-examining State agency physician, reviewed Plaintiff's medical records and completed a physical residual functional capacity assessment on May 22, 2007. (AR 151-57.) Dr. Meek concluded that Plaintiff could occasionally lift 20 pounds, frequently lift and/or carry (including upward pulling) 10 pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, push and/or pull (including operation of hand/foot controls) for an unlimited time, within the limitations for lifting and carrying. (AR 154.) Dr. Meek based these conclusions specifically on "multi-level degenerative changes" to Plaintiff's lumbar spine. (AR 154.)

Dr. Meek considered Dr. Gregorius's letters, particularly the facts that Plaintiff's prescribed exercises reduced the pain in his right leg, the range of motion in his spine became normal, and Dr. Gregorius noted that Plaintiff had declined surgery. (AR 157.) Dr. Meek opined that the severity or duration of the symptoms was disproportionate to the expected severity or expected duration on the basis of Plaintiff's medically determinable impairments. (AR 157.) Additionally, Dr. Meek commented that Plaintiff's "allegation of knee pain and numbness . . . is not fully credible as [his]

5

gait is intact." (AR 152.) Dr. Meek recommended a residual functional capacity ("RFC")[8] for light work.[9] (AR 152, 157.)

On September 24, 2007, Plaintiff underwent an x-ray to determine if he had acute tuberculosis, due to a positive purified protein derivative skin test on September 21, 2007. (AR 180, 185.) The x-ray was negative for active tuberculosis but showed signs of spondylosis; he underwent a computed tomography ("CT") scan the same day for further evaluation. (AR 179-180.) In a letter dated December 18, 2007, the CT scan yielded evidence of "degenerative changes of [his] thoracic spine." (AR 179.)

On October 15, 2007, Dr. Leonore Limos, a non-examining State agency physician, affirmed Dr. Meek's findings and conclusions. (AR 167.)

On January 4, 2008, Plaintiff was seen by Dr. Tso for cold symptoms and "worsening pain radiating to left leg in last few months." (AR 178.) Dr. Tso recommended "contin[uing] with stretches and pain management" and that Plaintiff be referred to physical therapy for overall strengthening. (AR 178.) Dr. Tso prescribed Hydrocodone-acetaminophen and Promethazine with codeine. (AR 178.) Dr. Tso's medical record indicated that Plaintiff had previously been prescribed Naproxen on August 23, 2007, and Vicodin on November 21, 2007 (AR 178), although no evidence of a visit on either date appears in the record.

---

[8] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.964(b).

On March 3, 2008, Plaintiff was seen by Dr. Tso for cold symptoms, but he did not report pain in his back or knee.[10] (AR 176.) On April 15, 2008, Plaintiff was seen for "continu[ing] . . . bilateral knee pain . . . [and] numbness to left leg." (AR 175.) Dr. Tso noted that Plaintiff's back pain was stable. (AR 175.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's applications initially and again on reconsideration. (AR 51-55, 56-62.) Consequently, on June 4, 2008, Plaintiff was granted his request for a hearing before an Administrative Law Judge ("ALJ"). (AR 66.) A hearing was held on June 25, 2008, before ALJ Sandra K. Rogers. (AR 66-80.) Plaintiff and a Vocational Expert ("VE") testified. (AR 22-41.)

**1.    Plaintiff's Testimony**

Plaintiff testified that he cannot "function the way [he] normally function[ed] . . . due to [his] back." (AR 25-26.) He attempted to remodel a house in 2006, but was unable to finish because of his back. (AR 26.) He tried working since then, but he cannot complete the work; as a result, he loses the work. (AR 26.) He was never paid for his incomplete work attempts. (AR 26-27.)

Plaintiff claimed to have "arthritis on the legs . . . all due to his back . . . [and] arthritis on [his right] knee." (AR 28.) He claimed his back pain was a constant "squeezing . . . [and] throbbing." (AR 29-30.) He rated his pain with medication as a five to six out of 10 but also stated it "goes to 10." (AR 30.) He described his level-10 pain as "so bad that you're ready to yell or go to the emergency room." (AR 30.) He stated that the longest time he can be on his feet at a time is 20 to 30 minutes (AR 30), the longest time he can sit in a chair is 20 to 30 minutes (AR 30-31), and the heaviest object he could lift is 10 pounds (AR 31). To alleviate the pain, he would "[lie] down, raise [his] legs, elevate [his] legs . . . take [his] medication . . . [and] do exercises that Dr. Gregorius instructed [him] to do." (AR 31.) He did not receive any type of pain injections for his various ailments (AR 31), and declined surgery with Dr. Gregorius because "[s]urgery was not going to be successful, due to the arthritis in the back, and the odds . . . didn't seem real good." (AR 31).

---

[10] Dr. Tso's medical record on March 3, 2008, indicates that Plaintiff began Promethazine with Codeine on February 19, 2008. (AR 176.) This is in direct conflict with Dr. Tso's medical record on January 1, 2008, which indicates Plaintiff was first prescribed with this medication on January 1, 2008. (AR 178.) Further, there is no indication in the record that Plaintiff was seen by Dr. Tso, or any other physician, on February 19, 2008. The record is not clear as to when Plaintiff was prescribed various medications or when the medications were refilled.

Plaintiff claimed that six to seven hours each day were spent lying down or elevating his legs. (AR 32.) Additionally, every two to three days, he would use cold treatments on his back. (AR 32-33.) He did not use any kind of support, such as a cane, brace, or crutches. (AR 33.)

On a normal day, Plaintiff would take medication "according to how [he felt] in the morning." (AR 33.) Plaintiff would water the grass, occasionally help his wife cook, and "play with the kids, help them with their homework." (AR 33-34.) He was unable to do household chores, although he had previously been able to do so. (AR 34.) His condition prevented him from doing recreational activities with his kids, such as taking them to the amusement park. (AR 34-35.) Plaintiff testified that Dr. Tso "gave [him] disability" and told him that he was disabled and that he could not work. (AR 32.) It was at this time that Plaintiff stopped working. (AR 32.)

Plaintiff testified that his pain medications caused side effects, such as dizziness and sleepiness. (AR 35.) He was unable to take long trips and work due to his condition. (AR 35.) Plaintiff had no previous involvement in "any kind of church, recreational, civic type clubs, groups [or] anything like that . . . [because he was] constant[ly] working to get ahead." (AR 35.)

### 2. Vocational Expert's Testimony

The VE characterized Plaintiff's past relevant work in "maintenance/repair" as heavy.[11] (AR 36.) The VE considered two hypothetical sets of limitations. (AR 37-38.) The VE testified that a person of Plaintiff's age, education and work experience who could lift 20 pounds occasionally and 10 pounds frequently; stand or sit about six hours in an eight-hour workday; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; but could never climb ladders, ropes, or scaffolds could not perform Plaintiff's past relevant work. (AR 37.) However, jobs in the national or regional economy existed that a hypothetical person with these limitations could perform, including cashier, garage attendant, and information clerk. (AR 37.) Given these limitations, there would be 90,000 jobs as a cashier, 10,000 jobs as a garage attendant, and 10,000 jobs as an information clerk. (AR 37.)

---

[11] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work." 20 C.F.R. §§ 404.1567(d), 416.964(d).

8

The VE considered a second hypothetical person of Plaintiff's age, education, and past work experience who was limited to lifting 20 pounds occasionally, 10 pounds repetitively; bending limited to occasional; sitting limited to two hours continuously, for a cumulative total of six hours per day; standing in one place limited to 30 minutes continuously, for a cumulative total of two hours per day; precluded from posturally demanding activities such as crouching, crawling, squatting, and climbing. The VE testified that these limitations would erode the number of cashier, garage attendant, and information clerk jobs. Given these limitations, there would be 15,000 to no jobs as a cashier; 10,000 jobs as a garage attendant, and 3,000 jobs as an information clerk. (AR 38.) Although these jobs would not allow for sitting and standing at will, the remaining jobs have flexibility in the posture in which the work can be done, allowing the second hypothetical person to perform them. (AR 38.) If the hypothetical person was required to sit for exactly six hours each day and stand for exactly two hours each day, the number of garage attendant jobs would be reduced to zero, but the number of cashier and information clerk jobs would remain the same. (AR 39.)

### 3. ALJ's Decision

On October 1, 2008, the ALJ issued a decision finding Plaintiff not disabled from June 1, 2006, through the date of her decision. (AR 12, 21.) The ALJ found that Plaintiff (1) meets the insured status requirements of the Social Security Act through December 1, 2010, (2) has not engaged in substantial gainful activity since June 1, 2006, (3) has two severe impairments: lumbar spondylosis and hypertension, (4) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and (5) has an RFC which allows him to perform light work available in the national economy. (AR 17-20.)

The ALJ did not consider medical evidence prior to June 1, 2006, stating that this period was not in dispute. (AR 19.) The ALJ gave less weight to the examining opinion of Dr. Pliam regarding Plaintiff's inability to stand due to Plaintiff's de minimis treatment record and the opinions of Drs. Meek and Limos. (AR 19.) The ALJ described Plaintiff's treatment record as de minimis because he alleged disability on June 1, 2006, but did not seek treatment until September 13, 2006. (AR 19.) Plaintiff's treating physician, Dr. Tso, made note of his degenerative disc disease with radiculopathy

on this date. (AR 19, 178.) Additionally, Plaintiff did not report back or knee pain again to his treating physician until January 4, 2008, but had been seen for cold symptoms between September 2006 and January 2008. (AR 19, 186.) Further, Dr. Tso recommended that he continue to stretch and exercise to relieve his pain at the January 2008 appointment. (AR 19, 178.) The ALJ gave greater weight to the opinions of Drs. Meek and Limos due to Plaintiff's de minimis treatment record, his ability to work after his injury in 2004 with no worsening condition, and his failure to pursue surgery. (AR 19.) The ALJ found Plaintiff's subjective complaints about the limiting effects of his alleged symptoms were not fully credible to the extent they were inconsistent with the RFC assessment. (AR 18-19.)

In an undated letter, received by the Appeals Council on July 15, 2009, Plaintiff sought review of this decision. (AR 7.) On August 3, 2009, the Appeals Council denied review. (AR 3-6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

### C. Plaintiff's Contentions on Appeal

On April 3, 2010, Plaintiff filed a complaint for review of the ALJ's decision by this Court. (Doc. 1.) Plaintiff seeks a reversal of the final decision of the Commissioner asserting that the ALJ erred by improperly rejecting Plaintiff's testimony and the opinions of Drs. Gregorius and Pliam, improperly relying on VE testimony, and failing to appropriately apply Social Security Rulings ("SSR") 82-59, 96-7p, 96-8p and 00-4p.[12]

### III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial

---

[12] SSRs are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding precedent upon ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.   APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the

requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

### A.   Plaintiff's Credibility

The ALJ found that Plaintiff's statements about his subjective limitations were not entirely credible to the extent they were not consistent with the RFC assessment. (AR 19.) As an initial matter, there is disagreement between Plaintiff and the Commissioner regarding the reasons the ALJ articulated for discounting Plaintiff's credibility. Plaintiff asserts the ALJ found him not entirely credible regarding the extent of his limitations because Plaintiff was able to work after his alleged onset date with no worsening of his condition, his de minimis treatment record, and his declination to undergo surgery. (Plaintiff's Opening Brief (Doc. 15), at 9.) The Commissioner asserts that the ALJ did not discredit Plaintiff because he did not pursue surgery, but discredited him "because the allegations were inconsistent with [his] daily activities and the medical evidence." (Commissioner's Opposition Brief (Doc. 16), at 12:15-17.)

#### 1.   Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir.

2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

**2.    The ALJ's Reasons For Rejecting Plaintiff's Credibility Are Inadequate**

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. Therefore, absent affirmative evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing.

The ALJ's decision is ambiguous in addressing Plaintiff's credibility. The credibility determination overlaps and blends with the ALJ's discussion of the weight given to the opinions of Drs. Pliam and Meek. As a result, it is difficult to understand all of the reasons the ALJ considered in making the credibility finding. (AR 19.) This ambiguity is reflected in the parties' disagreement about the reasons the ALJ attempted to articulate in finding Plaintiff not entirely credible.

The ALJ provided the following analysis:

> Although the claimant alleges that he became disabled on June 1, 2006, he did not seek treatment from his treating physician between then and September 13, 2006. At that time his doctor wrote that the claimant was experiencing degenerative disc disease with radiculopathy (Exhibit 8F/13). Although he sought treatment for various cold symptoms and perhaps a sinus infection in the interim, he does not appear to have returned to seek treatment for his back and leg pain until January 2008. His doctor recommended that he stretch and exercise (Exhibit 8F/4). When he next returned, in April 2008, he mentioned the knee pain, but not back pain (Exhibit 8F/1).

> At the consultative examination, the claimant told the examining doctor that he injured his back at work in 2004. Again, the undersigned observes that the claimant was able to work despite his condition until 2006. The doctor noted that an MRI showed multi-leveled degenerative changes of the claimant's lumbar spine, with central stenosis and a disc herniation. The claimant stated that he had been offered surgery but declined because there was only a 50 percent chance that it would result in improvement. The doctor noted that the claimant had a decreased range of motion of his lumbar spine. Although the claimant reported some numbness in his lower extremities, examination revealed that his sensation was intact. The claimant also did not have radicular signs. Despite his reported knee pain, the examination of his knees was completely normal. The doctor did not diagnose the claimant with any impairment of the knees. The orthopedist concluded that the claimant could lift 20 pounds occasionally and 10 pounds frequently. He can occasionally bend. He can sit for six hours a day if he is given normal rest breaks. He can stand for a total of two hours a day and would be precluded from crouching, crawling, or squatting (Exhibit 2F). The undersigned gives somewhat less weight to the portion of this opinion regarding the claimant's inability to stand, as it is less consistent with the claimant's de minimis treatment records and the opinions of the other physicians of record.
>
> In contrast, [Dr. Meek] concluded that the claimant could perform a full range of light work that does not require him to climb ladders, ropes, or scaffolds. The claimant would occasionally be able to climb ramps or stairs, and occasionally balance, stoop, kneel, crouch, or crawl. The doctor imposed no other limitations (Exhibit 4F). Given the claimant's de minimis treatment history, his ability to work for quite some time despite his impairment with no worsening of his condition, and his failure to pursue surgery, the undersigned gives greater weight to this exhibit.

(AR 19.)

As an initial matter, the fact that neither party agrees on the reasons why the ALJ discredited Plaintiff tends to suggest that the ALJ did not set forth a particularly cogent discussion of all the factors influencing the credibility determination. To the extent that the ALJ appeared to reject Plaintiff's credibility because of a "de minimis" treatment record, the ALJ refused to consider any medical records prior to June 2006. (AR 19 ("The undersigned has not considered the claimant's medical records before the claimant's alleged onset date, June 1, 2006, as that period is not in dispute.") However, the longitudinal medical record has relevance to Plaintiff's credibility.

Social Security Ruling 96-7p, which provides guidance to the ALJ in considering a claimant's credibility, specifically explains that "an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purpose of judging the credibility of the individual statements." SSR 96-7p, 1996 WL 374186, at * 7 (July 2, 1996). Thus, Plaintiff's 2005 treating records that bear directly on his back impairment and the pain he

suffers as a result are relevant and should have been considered. These records tend to corroborate Plaintiff's allegations that he had been seeking treatment since his injury in 2004, he had repeatedly sought out treatment in 2005 and was referred to specialists, but he viewed his treatment options as exhausted by 2006 when he alleges he became completely disabled. The medical records prior to June 2006 show that Plaintiff sought treatment and supports Plaintiff's explanation that the reason he did not seek more treatment in 2006 was that he was already doing everything that the doctors had told him to do, and he was simply at home implementing the treatment regime. The 2005 treating physicians' records could materially affect the ALJ's credibility determination.

Social Security Ruling 96-7p also explains that "[p]ersistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms." SSR 96-7p, 1996 WL 374186, at *7. The medical evidence prior to June 2006 contains information relevant to these factors. Thus, to the extent that the ALJ determined Plaintiff's treatment record was de minimis, but refused to consider approximately 18 months of treating records, this is a legally insufficient reason to discredit Plaintiff, and it ignores relevant and probative evidence. *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (ALJ must explain why significant probative evidence has been rejected); *see also Magallanes v. Brown*, 881 F.2d 747, 755 (9th Cir. 1989).

Plaintiff asserts that the ALJ improperly found him not credible because he did not pursue surgery. The Commissioner disputes that the ALJ's credibility determination was predicated on Plaintiff's failure to pursue surgery. It unclear how Plaintiff's decision not to pursue the surgery suggested by Dr. Gregorius in 2005 was considered by the ALJ in determining credibility. The ALJ noted Plaintiff's refusal to pursue surgery, but did so only in relation to the weight of the medical evidence without any explanation as to why it mattered. (*See* AR 19.)

In any event, to the extent that the ALJ rejected Plaintiff's credibility because he refused surgery, this is not a clear and convincing reason. The ALJ did not relate the observation that

Plaintiff refused surgery to any discussion about how it impacted Plaintiff's credibility. Further, the only doctor who discussed surgery with Plaintiff as a treatment option was Dr. Gregorius. (*See* AR 31, 141.)[13] Dr. Gregorius' treatment notes are from 2005, and these records were not considered by the ALJ. Additionally, Plaintiff offered testimony at the hearing as to why he did not pursue surgery when Dr. Gregorius presented it as a treatment option. (AR 31.) SSR 96-7p provides that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7. Plaintiff's explanation as to why he did not pursue surgery was not adequately discussed.

The Commissioner states that inconsistencies between Plaintiff's testimony and the medical record were part of the ALJ's basis for rejecting Plaintiff's credibility. While the ALJ noted that some of Plaintiff's statements to Dr. Pliam regarding his symptoms were not corroborated by the medical findings (AR 19), this is not a clear and convincing reason to reject Plaintiff's credibility about his pain symptoms. Isolated statements made to Dr. Pliam without a discussion of the overall record is not an adequate consideration of credibility. The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).

Moreover, these are not the inconsistencies that the Commissioner asserts the ALJ found. Rather, the Commissioner asserts that the ALJ found Plaintiff's testimony to be inconsistent with Drs. Meek and Limos' opinions that Plaintiff could engage in light work. This does not meet the requisite level of specificity to explain *how* Plaintiff's testimony is inconsistent with the medical evidence. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (to reject claimant's subjective complaints, ALJ must provide specific, cogent reasons). Further, Plaintiff's testimony related mostly to his pain, and pain is often not corroborated or observed in medical findings. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.1989) ("pain is a completely subjective phenomenon" and "cannot be

---

[13] Plaintiff reported to Dr. Pliam that Dr. Gregorius had recommended surgery, but Plaintiff explained to Dr. Pliam that the odds that surgery would relieve his pain were not particularly favorable. (AR 144.)

16

objectively verified or measured"). More importantly, this rationale is not articulated by the ALJ; it is a post-hoc argument which the Court cannot consider. *See, e.g., Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) (an agency decision cannot be affirmed based on a ground that the agency did not invoke in making its decision). The Commissioner also asserts that Dr. Meek found Plaintiff's subjective complaints were only partially credible. This too was never discussed by the ALJ as part of the credibility determination. *See id.*

The Commissioner contends that the ALJ found Plaintiff's testimony inconsistent with his daily activities. (Doc. 16, at 12.) A claimant is not required to be completely incapacitated to qualify for disability benefits; however, daily home activities are relevant evidence to consider in a credibility analysis where such activities are transferable to the workplace. *Fair*, 885 F.2d at 603. Here, the only discussion of Plaintiff's daily activities was the ALJ's recitation of Plaintiff's statement of his limitations, which *preceded* the ALJ's discussion of Plaintiff's credibility. (*See* AR 18.) Along with Plaintiff's statement of his limitations, the ALJ noted that, "[d]espite the pain, he remains able to do some household tasks, such as watering his grass and helping his children with their homework." (AR 18.) The decision does not reflect that the ALJ found Plaintiff less credible in light of his daily activities.

Nevertheless, even if the Court could infer that the ALJ found Plaintiff not credible because he was able to water the grass and help his children with homework, this is not clear and convincing rationale to warrant an adverse credibility determination. "[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [a claimant's] credibility as to [a claimant's] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Daily activities are grounds for an adverse credibility finding if a claimant "is able to spend a substantial part of [the] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (citations and internal quotation marks omitted). Therefore, to conclude that daily activities warrant an adverse credibility determination, "[t]he ALJ must make specific findings relating to [the daily] activities and their transferability[.]" *Id.* (citation and internal quotation marks omitted). The ALJ did not make specific findings regarding Plaintiff's

daily activities or their transferability to a work setting. Nor did the ALJ discuss how this impacted Plaintiff's credibility, if at all. To the extent that daily activities were a reason for discounting Plaintiff's credibility – and it does not appear that they were – it is not a clear and convincing reason sufficient to justify the ALJ's adverse credibility determination.

The Court cannot conclude that the ALJ's credibility analysis is legally sufficient. The credibility determination is not based on all the relevant evidence of record because the treating records prior to June 2006 were not considered. This is especially important because one of the reasons the ALJ discussed in rejecting Plaintiff's credibility was the de minimis treatment record. Beyond not considering all the relevant records, the reasons stated for rejecting Plaintiff's credibility, to the extent that the Court and the parties can discern them, are not clear and convincing.

**B.     Weight of the Medical Evidence**

**1.     Any Error in the ALJ's Consideration of Dr. Pliam's Opinion Is Harmless**

Plaintiff argues that the ALJ erred by failing to give weight to Dr. Pliam's finding that Plaintiff can only stand for a total of two hours in an eight-hour workday. Even assuming, *arguendo*, that Dr. Pliam's opinion was improperly rejected, Plaintiff has not established how any error was prejudicial. *Shinseki v. Sanders*, __ U.S. __, 126 S.Ct. 1696 (2009) (claimant carries the burden to establish how agency error is prejudicial). The VE provided testimony that there were significant jobs that Plaintiff could perform even if he was limited to standing no more than two total hours per day, pursuant to Dr. Pliam's opined limitation. (AR 38-39.) Thus, any error in disregarding Dr. Pliam's opinion was harmless in light of the fact that the limitation opined by Dr. Pliam was incorporated into the limitations that the VE considered in giving testimony regarding Plaintiff's ability to do alternative work. *See Stout v. Comm'r*, 454 F.3d 1050, 1055-56 (9th Cir. 2006).

**2.     Dr. Gregorius' Opinion that Plaintiff is Permanently Disabled**

Plaintiff argues that the ALJ rejected Dr. Gregorius' August 2005 opinion that Plaintiff is totally and permanently disabled without providing legally sufficient reasons for doing so. As discussed above, the Court finds that the medical records prior to June 2006 are relevant, particularly to the credibility analysis, and should have been considered by the ALJ. Those records, which include Dr. Gregorius' opinion that Plaintiff is totally and permanently disabled, will be considered

by the ALJ on remand. To the extent that these records contain medical findings that are relevant and probative, they must be considered.

**C.     VE's Testimony and Conflicts with the Dictionary of Occupational Titles**

Plaintiff asserts that the ALJ did not explicitly inquire whether the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"), which is required pursuant to SSR 00-4p. (Doc. 15, at 16.) The Commissioner concedes that the ALJ failed to follow SSR 00-4p, but argues that Plaintiff failed to identify any actual inconsistency between the DOT and the VE's testimony. (Doc. 16, at 13-14.) Pursuant to SSR 00-4p, an ALJ has an affirmative duty to inquire of a VE whether the testimony given regarding the requirements of a job conflicts with the DOT and, if so, whether there is a reasonable explanation for the conflict. *Massachi v. Astrue*, 486 F.3d 1149, 1152-53 (9th Cir. 2007). Such a failure by the ALJ is a procedural error and will be considered harmless where there is no conflict with the DOT or whether the VE provides sufficient support for the conclusion. *Id.* at 1154 n.19; *see Bray*, 554 F.3d at 1233 ("When there is a conflict between the VE evidence and the DOT, it is a duty of the ALJ to inquire on the record as to the reason for the inconsistency before relying on the VE's evidence.").

Here, the ALJ relied on the VE's testimony that, given Plaintiff's limitations, he could perform work as a cashier and an information clerk. (AR 20, 39.) The ALJ also explicitly found that this testimony is consistent with the information contained in the DOT. (AR 21.) Plaintiff has presented no argument how the VE's testimony actually conflicted with the requirements of the jobs identified in the DOT, only that the ALJ erred in a technical sense by not inquiring of the VE whether his testimony was consistent with the DOT. Plaintiff has not carried his burden to show how this procedural error was prejudicial. *Sanders*, 129 S.Ct. at 1706.

## VI.   RECOMMENDATIONS

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and therefore RECOMMENDS that the ALJ's decision be reversed and the case be remanded to the ALJ to make additional findings.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fifteen (15) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   August 2, 2011**                              /s/ Sheila K. Oberto
                                                                     UNITED STATES MAGISTRATE JUDGE